UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRYSM GROUP, LLC<br><br>      Plaintiff,<br><br>-against-<br><br>EMERITUS INSTITUTE OF MANAGEMENT PTE LTD, d/b/a EMERITUS INSTITUTE OF MANAGEMENT INC.,<br><br>      Defendant. | Civil Action No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Prysm Group, LLC ("Plaintiff" or "Prysm"), by and through its undersigned counsel, Bochetto and Lentz, P.C., hereby files this Civil Action Complaint against Defendant Emeritus Institute of Management Pte. Ltd. d/b/a Emeritus Institute of Management Inc. ("Defendant" or "Emeritus"), alleging as follows:

## NATURE OF THE ACTION

1. This action arises out of Emeritus' refusal to honor its contractual obligations under the Confidentiality and Nondisclosure Agreement (hereinafter, "NDA") between itself and Prysm.

2. In late-2022, Prysm employed an investment bank, D.A. Davidson & Co ("D.A. Davidson"), to assist in the arduous process of evaluating potential acquisition suitors or investors.

3. One potential acquisition suitor, Emeritus, asked D.A. Davidson to share, *inter alia*, the financials, operational metrics, strategic plans, and growth projections for Prysm.

4. Prior to sending these metrics, D.A. Davidson and Prysm required Emeritus to sign an NDA.

5. Since both Prysm and Emeritus are in the business of providing online education and professional programs to universities across the globe (and were, in fact, competitors), they understood the importance of this NDA and readily agreed to comply with its terms.

6. On October 17, 2022, Emeritus and Prysm executed the NDA.

7. Emeritus has since violated the NDA, however, by sharing Prysm's confidential pitch deck (*i.e.*, a presentation that outlines sensitive information, including the Prysm's strategic operations and business plan, as well as its products and services, client information, pricing, and more) with a third party.

8. Indeed, even the very fact that Prysm was seeking such a sale was confidential under the agreement, yet Emeritus still disclosed this fact to at least one third party.

## THE PARTIES

9. Plaintiff Prysm Group, LLC ("Plaintiff" or "Prysm") is an educational technology consulting firm that assists universities with the implementation and effectuation of online courses, with a registered address of 30 N. Gould Street, Suite R, Sheridan, WY 82801. None of its members are citizens of either Delaware or Massachusetts.

10. Defendant Emeritus Institute of Management Pte. Ltd., doing business in the United States as Emeritus Institute of Management, Inc. ("Defendant" or "Emeritus") provides online business and educational programs to universities, with its principal place of business located at 78 Shenton Way, #20-02, Singapore 070120. Emeritus' United States operations are incorporated in Delaware with a principal place of business of 50 Milk Street, 16th Floor, Boston, MA 02109.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332, as complete diversity of citizenship exists between the parties and the amount in controversy is greater than $75,000, exclusive of interest and costs.

12. Paragraph 10 of the NDA executed by and between Plaintiff and Defendant states, "[t]his Agreement and all matters relating hereto are governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of laws provisions of such State. Each Party irrevocably submits to the exclusive jurisdiction of the federal or state courts of New York in any such suit, action or proceeding." **Exhibit A**, pg. 3.

13. Therefore, this Court has proper venue over this matter and personal jurisdiction over Plaintiff and Defendant, as the parties have each explicitly consented to the laws of the State of New York.

**FACTS COMMON TO ALL COUNTS**

14. Established in 2018, Prysm is a consulting firm that assists universities with the implementation and effectuation of online educational programs, among other business lines.

15. Shortly after its formation, Prysm gained notoriety in the online education space.

16. By 2021, Prysm had garnered the attention of numerous reputable institutions, with one of the most notable being the University of Pennsylvania.

17. On June 30, 2021, Prysm entered into a contractual agreement with The Trustees of the University of Pennsylvania a/k/a The Wharton School (hereinafter, "Wharton") to assist in the development and implementation of online certificate programs on the topics of emerging technologies.

18. These programs proved wildly successful for both Prysm and Wharton.

*Plaintiff Prysm's Search for an Acquirer / Investor*

19. After several years of explosive growth, Prysm began evaluating its options.

20. Indeed, in 2022, Prysm started to ponder the possibility of being acquired by another entity or alternatively, securing a capital investment to fuel further expansion.

21. On August 10, 2022, Prysm hired the investment bank, D.A. Davidson, to assist with this search; Prysm and D.A. Davidson signed a letter of engagement.

22. Over the next few months, Prysm and D.A. Davidson worked diligently in developing an extensive and highly confidential presentation to be shared with the potential acquisition suitors and/or investors.

23. This presentation was titled, Confidential Information Presentation (the "CIP").[1]

24. Embedded within the fifty-six (56) page CIP are five sections covering a vast array of Prysm insights and confidential metrics; These sections are labeled: (I) Executive Summary, (II) Investment Highlights, (III) Growth Strategies, (IV) Company Operations, and (V) Financials.

25. All of the information contained in the CIP is of a highly confidential nature.

26. As a result of the highly confidential nature of the information embedded therein, each possible acquisition suitor and/or investor was required to sign a "Confidentiality and Nondisclosure Agreement" prior to receiving the CIP.

27. The NDA read, in relevant part:

> In connection with the evaluation of a possible business transaction between the parties hereto (the "Purpose"), Disclosing Party may disclose to Recipient, or Recipient may otherwise receive access to, Confidential Information (as defined below). Recipient shall use the Confidential Information solely for the Purpose and . . . shall not disclose or permit access to Confidential Information other than to its affiliates and its or their employees, officers, directors, shareholders, attorneys, accountants, financing sources, consultants and financial advisors (collectively, "Representatives") who: (a) need to know such Confidential Information for the Purpose; (b) know of the existence and terms of this

---

[1] Given the sensitivity of this document, it is not attached to this Complaint. Prysm stands ready to provide the Court with a copy of this document for *in camera* review, if so requested.

> Agreement; and (c) are bound by confidentiality obligations no less protective of the Confidential Information than the terms contained herein. Recipient shall safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its most sensitive information and no less than a reasonable degree of care. Recipient shall promptly notify Disclosing Party of any unauthorized use or disclosure of Confidential Information and take all reasonable steps to prevent further use or disclosure. Recipient will be responsible for any breach of this Agreement caused by its Representatives.

*See* Ex. A, pg. 1.

28. Indeed, even the very fact that the parties were having these discussions was itself confidential. Ex. A, § 2(x).

29. The NDA explicitly stipulates that any recipient of confidential information in connection with the evaluation of a possible business transaction between the parties is strictly prohibited from disclosing said confidential information to third parties. *See generally id.*

30. In the months that followed, D.A. Davidson leveraged its professional network and began to "shop" Prysm to prospective acquisition suitors and/or investors.

31. Among the potential suitors was Emeritus, a large corporation with more than 1,750 employees and a reported market value in excess of $3 billion, specializing in the development and offering of online short courses, certificate programs, degree programs, professional certificates, and senior executive programs for universities globally.

32. During this time, Emeritus and Prysm were both working alongside Wharton on various products relating to the provision of online education programs.

33. While Emeritus and Prysm had separate contracts with Wharton coinciding with their respective business models, both focused on the development and marketing of online education courses.

34. Although the entities were in business with a common partner (i.e., Wharton), Emeritus and Prysm were at all relevant times direct competitors in the online education space.

35. Indeed, one of the reasons that Wharton had hired Prysm was to diversify and reduce its growing reliance on Emeritus. *See* **Exhibit B** (Head of Wharton Online Donald Huesman, "We actually engaged Prysm Group in part to balance our growing involvement with Emeritus.").

36. Nonetheless, Emeritus recognized the synergies between itself and Prysm, and jumped at the possibility of acquiring a smaller, yet quickly growing company (with a superior strategy and domain experience), in the same market.

37. As a result, Emeritus set up a time to chat with D.A. Davidson about Prysm.

38. Prior to their discussion – as D.A. Davidson had done with all of the possible acquisition suitors and/or investors – D.A. Davidson sent Emeritus an NDA to sign.

39. On October 17, 2022, Emeritus and Prysm executed the NDA. *See* Ex. A, pg. 3.

40. On October 19, 2022, D.A. Davidson scheduled a conference to take place between itself, Prysm, and Emeritus, to discuss the possible Prysm acquisition or investment and, *inter alia*, share the valuable (but highly confidential information) within the CIP.

41. On October 27, 2022, the above-mentioned parties attended this conference to discuss the potential acquisition.

42. During this conference, D.A. Davidson went into extraordinary detail about Prysm's business model, financials, competitive strategies, client details, and future growth prospects.

43. In addition to the spoken correspondence, D.A. Davidson projected a fifteen (15) page condensed version of the CIP onto the shared screen, using it as a visual guide to explain the organizational structure of Prysm and elaborate on the confidential data embedded therein.

44. After the conference concluded, D.A. Davidson followed up with the Emeritus team via email, forwarding them all of the materials covered during the chat:

"Emeritus Team,

We wanted to share materials we covered in today's fireside chat. Please let me know if you have any other questions regarding the materials, models, etc."

*See* **Exhibit C.**

45. One of the many "materials" forwarded to the Emeritus team was the CIP.

46. Because Emeritus signed the NDA – barring them from distributing any "confidential information" received "[i]n connection with the evaluation of [the] possible business transaction between the parties" – Prysm was comfortable sharing the CIP. Ex. A.

47. At all times relevant, both D.A. Davidson and Prysm assumed that Emeritus was acting pursuant to the terms of the NDA and New York's implied covenant of good faith and fair dealing.

48. The implied covenant of good faith and fair dealing is an obligation that assumes the parties to a contract will act in good faith and deal fairly with one another without breaking their word, using shifty means to avoid obligations, or denying what the other party obviously understood. (*511 W. 232nd Owners v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).

49. Emeritus ultimately declined to acquire and/or invest in Prysm.

### *Defendant Emeritus' Breach of the NDA*

50. In January 2023, Prysm sent the year end reconciliation report for its contract with Wharton for the services provided.

51. Notably, throughout the course of the preceding year, the head of Wharton Online ("Mr. Huesman") had asked Prysm to perform ***Wharton's*** original obligations under the parties'

contract, in addition to the original marketing and payment processing services that Prysm was supposed to provide.

52. Mr. Huesman had promised to compensate Prysm for these services, and the parties kept detailed notes regarding their almost weekly calls regarding who was performing what services under the contract.

53. When Wharton received the bill from Prysm for such services, it did not want to pay, and began scheming for ways to get out of this obligation to Prysm. *See generally* **Exhibit D**.

54. Wharton began asking their other vendors, notably Emeritus, for confidential information about Prysm to use as leverage in these negotiations.

55. The Wharton personnel involved in this undertaking were, at a minimum, Jason "Jay" Canavan ("Mr. Canavan"), Eric Hamberger, Stephanie Stawicki, and Mr. Huesman.

56. Ultimately, Emeritus agreed to share the CIP with Wharton.

57. Upon information and belief, one Michael Malefakis ("Mr. Malefakis"), or others acting at his direction, was the point person for Emeritus in manifesting this breach.

58. Mr. Malefakis previously worked at Wharton and knew many or all of the Wharton personnel involved in this scheme.

59. Emeritus was motivated to breach the NDA for two reasons 1.) to ingratiate themselves with Wharton, a major client, and 2.) to kneecap the ability of Plaintiff, an up and coming competitor, to compete with Emeritus for major clients like Wharton.

60. Now, having unlawfully obtained access to the CIP, Wharton scoured it for any information that could be used against Prysm to avoid fulfilling its contractual payment obligations.

61. On February 7, 2023, Wharton sent a demand letter to Prysm terminating the contract, threatening to sue Prysm for breach of intellectual property provisions in said contract, and requesting they "cease and desist" the use of Wharton's trademarks in their "pitch decks" and "pitch books." *See generally* **Exhibit E**.

62. Perplexed as to Wharton's reference to "pitch decks," Prysm reviewed the letter.

63. Whilst reviewing the allegations set forth in the demand letter, it became patently obvious that Wharton had somehow obtained the CIP shared with Emeritus:

> Prysm, along with all of its affiliates and subsidiaries, currently stands in material breach of its obligations under the Agreement both confidentiality and the unauthorized use of the Wharton 'Marks' (as defined in our Agreement) in, among other places, Prysm's **pitch decks** for potential investors and acquirors.
>
> Moreover, Prysm's unauthorized use of the Wharton Marks in these **pitch decks** and other places constitute separate, material breaches of the Agreement.
>
> At no point did Wharton authorize Prysm to use the Wharton name or logo in its **pitch books** to potential investors or acquirors.
>
> As the 'Wharton' name is the most important piece of intellectual property of this country's first business school, you will not be surprised to learn that The University of Pennsylvania holds the trademark . . . which Prysm so cavalierly used for its own profit in these **pitch decks**.
>
> Given the important of its name and brand to the Wharton School, Wharton cannot and will not permit unauthorized uses such as those appearing in these **pitch deck[s]** . . .
>
> Wharton hereby also demands that Prysm and its affiliates immediately send Wharton all copies of so-called '**pitch books**' and other investment-related materials . . .

Ex. E, pgs. 2 to 6 (emphasis added).

64. It is not until halfway through this letter that Wharton even raised any grievances about the financial reconciliation of the parties' contract, which has always been the "real" disagreement between Wharton and Prysm.

9

65. Wharton threatened to file for a preliminary injunction to enjoin these alleged violations relating to Wharton's intellectual property.

66. In an attempt to scare Prysm's non-lawyer members into backing down, Wharton (through its in-house counsel, Mr. Canavan) also threatened to "pierce the corporate veil" and sue Plaintiff's members "*in their personal capacities*, as well as all entities under common control with Prysm[.]" *See* Ex. E, pg. 7 (emphasis in original).

67. To be clear, Wharton had no legitimate basis to make this threat, as this is clearly a dispute between two businesses and there is nothing that would warrant veil piercing here.

68. Still, Wharton sent this over the top letter (utilizing the information improperly shared by Emeritus) in a pre-suit, extortionary shakedown attempt, hoping that Prysm would back down.

69. This threatened preliminary injunction was an empty threat, however, and Wharton never filed such an action.

70. Undeterred by Wharton's threats, **Prysm** then filed suit against Wharton approximately one month later. *See Prysm Group, LLC v. Trustees of the Univ. of Pa.*, No. 2:23-CV-00995-MKC (E.D. Pa.) (the "EDPA Action").[2]

71. While Wharton initially maintained the fiction that it cared at all about these alleged intellectual property grievances by bringing a counterclaim relating to these issues, Wharton would later ***voluntarily dismiss*** such counterclaim, as it has always been a mere pretext for Wharton to breach its agreement with Prysm and evade fulfilling its contractual obligations and paying the bill. *See id.*, ECF Doc. 20.

---

[2] This action was originally filed in the Philadelphia Court of Common Pleas but removed by Wharton to federal court.

10

72.     Only a select few companies had access to the pitch deck, and discovery in the EDPA Action has revealed that it was clearly Emeritus that violated the NDA.

73.     However, Prysm was only able to discern the identity of the breaching company (*i.e.* Emeritus) on December 14, 2023, when Mr. Huesman was deposed. *See* **Exhibit F**.

74.     Specifically, Mr. Huesman testified that he spoke with Mr. Malefakis at Emeritus about the fact that Prysm was seeking acquirors, although the specific date of these conversations has yet to be determined. *See* Ex. F, at 179:20-180:18.

75.     Upon further investigation, it is now apparent that in early 2023 Wharton conspired with Emeritus – a direct competitor of Prysm – to obtain sensitive information about Prysm that could be used to terminate Wharton's agreement with Prysm and if need be, fabricate a defense in a lawsuit resulting therefrom.

76.     Despite being subject to an NDA, Emeritus opted to ignore its terms, in order to gain an improper competitive advantage over a rival and ingratiate itself to a major client.

77.     Emeritus knowingly and willfully supplied Wharton with the confidential CIP, amongst other materials and information, to aid in the termination of Prysm because Emeritus saw it as an opportunity to undermine a rapidly emerging competitor in the online education market.

78.     Emeritus' sharing of the CIP to Wharton was a direct violation of the NDA.

## **DAMAGES**

79.     As a direct and proximate result of Defendant Emeritus' breach of the NDA, Plaintiff has sustained significant financial and reputational damages, including but not limited to:

  a. Loss of revenue stemming from the improperly-terminated agreement with Wharton;
  b. Opportunity and reputational costs relating to future contracts in excess of $150,000;
  c. The disintegration of its business, including the entire management consulting wing;

    d. Loss of the opportunity to sell Prysm through D.A. Davidson due to such foregoing disintegration;
    e. Attorney's fees spent litigating the EDPA Action; and
    f. Further costs incurred with having confidential information shared to unauthorized third party(ies).

## COUNT I
## (BREACH OF CONTRACT)
## PLAINTIFF PRYSM v. DEFENDANT EMERITUS

80. Plaintiff Prysm hereby incorporates by reference all prior paragraphs as if set forth fully at length herein.

81. At all times relevant, a valid and binding Confidentiality and Nondisclosure Agreement a/k/a NDA exists between Prysm and Emeritus. Ex. A.

82. The NDA provides, in relevant part, that "[i]n connection with the evaluation of a possible business transaction between the parties . . . [Emeritus] shall not disclose or permit access to Confidential Information other than to its affiliates and its or their employees, officers, directors, shareholders, attorneys, accountants, financing sources, consultants and financial advisors (collectively, "Representatives") who: (a) need to know such Confidential Information for the Purpose; (b) know of the existence and terms of this Agreement; and (c) are bound by confidentiality obligations no less protective of the Confidential Information than the terms contained herein." *Id.* at ¶ 1.

83. The term "Confidential Information" is then defined as "all non-public, proprietary or confidential information of [Prysm], in oral, written, electronic or other tangible or intangible form, whether or not marked or designated as 'confidential,' and all notes, analyses, summaries and other materials prepared by [Emeritus] or any of its Representatives . . . ." *Id.* at ¶ 2.

84. Prysm, through D.A. Davidson, sent Emeritus the confidential information as a direct and proximate result of Emeritus' expressed interest in acquiring and/or investing in Prysm.

85. One of the confidential materials forwarded to Emeritus was the CIP.

86. The CIP – which plainly stands for Confidential Information Presentation – was at all times a non-public, proprietary and/or confidential information shared with Emeritus for the sole purpose of their evaluation of a possible business transaction between the parties

87. Despite understanding its confidentiality, and not having the authorization to do so, Emeritus provided Wharton with the CIP.

88. Prysm required Emeritus to sign the NDA prior to receiving any confidential information, including but not limited to the CIP, because of the valuable nature of the information.

89. Emeritus undoubtedly agreed to the terms of the NDA as evidenced by the signature of Gabriel Lee, Senior Director of Emeritus, executed on October 17, 2022. *Id.*

90. Therefore, by sharing the CIP with Wharton, Emeritus is in breach of the NDA.

91. Furthermore, Prysm advanced all confidential information, including but not limited to the CIP, in reliance on Emeritus' representations to safeguard it from unauthorized use.

92. Indeed, Emeritus explicitly agreed to "safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its most sensitive information and no less than a reasonable degree of care." *Id.*

93. Emeritus failed to safeguard the CIP from unauthorized use, access or disclosure, and in fact intentionally shared this information with Wharton.

94. In the event that Emeritus accidentally or purposefully disclosed information pursuant to the NDA, Emeritus was also required to "promptly notify [Prysm] . . . and take all reasonable steps to prevent further use or disclosure." *Id.*

95. Emeritus never notified Prysm about their disclosure of the CIP to Wharton.

96. Emeritus never notified Prysm about Wharton's unauthorized use of the CIP.

97. Emeritus never took any steps to prevent the use and/or disclosure of the CIP.

98. Emeritus has therefore breached multiple provisions of the NDA, and in turn, the implied covenant of good faith and fair dealing – which is an implied obligation that assumes the parties to a contract will act in good faith and deal fairly with one another without breaking their word, using shifty means to avoid obligations, or denying what the other party obviously understood. *See 511 W. 232nd Owners v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).

99. Upon further investigation, it is now apparent that Emeritus purposefully supplied Wharton with the CIP in violation of the NDA because Emeritus saw it as an opportunity to undermine Prysm, a rapidly emerging competitor in the online education space.

100. As a result of the breach, Prysm has suffered damages, including but not limited to financial harm and reputational harm, as more fully set forth herein.

**WHEREFORE**, Plaintiff Prysm Group, LLC respectfully requests this Honorable Court enter judgment in its favor and against Defendant Emeritus Institute of Management Pte. Ltd. d/b/a Emeritus Institute of Management, Inc. in an amount well in excess of $150,000 that will fully and fairly compensate Plaintiff, pre-and post-judgment interest, costs of suit, attorneys' fees, and such further relief deemed just and equitable by this Honorable Court.

## JURY TRIAL DEMAND

101. Plaintiff hereby demands a jury trial of twelve (12) jurors.

Respectfully submitted,

**BOCHETTO & LENTZ, PC**

*/s/Gavin P. Lentz*

Date: December 6, 2024                By: _____
                                           Gavin. P. Lentz, Esquire

                                                                         Ryan T. Kirk, Esquire (*admission forthcoming*)
                                                                          1524 Locust Street
                                                                          Philadelphia, PA  19102
                                                                          (215) 735-3900
                                                                          glentz@bochettoandlentz.com
                                                                          rkirk@bochettoandlentz.com

                                                                        *Attorneys for Plaintiff*