```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/2/2025_
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PRYSM GROUP, LLC,

                              Plaintiff,

            - against -

EMERITUS INSTITUTE OF MANAGEMENT PTE
LTD and EMERITUS INSTITUTE OF
MANAGEMENT, INC.,

                              Defendants.

**24 Civ. 9305 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Prysm Group, LLC ("Prysm") brought this action against defendants Emeritus Institute of Management PTE LTD ("Emeritus Singapore") and Emeritus Institute of Management, Inc. ("Emeritus US," and together, "Defendants"). Prysm alleges that Defendants violated the terms of a confidentiality and nondisclosure agreement ("NDA") between the parties. (See "Am. Compl.," Dkt. No. 18.) Defendants now move to partially dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Prysm cannot sustain its various tort claims.[1] (See "Defs.' Mot.," Dkt. No. 24; "Defs.' Reply," Dkt. No. 26.) For the reasons discussed below, Defendants' motion to partially dismiss the Amended Complaint is **GRANTED**.

---

[1] Defendants do not seek dismissal of Prysm's breach of contract or unjust enrichment claims.

## I.    <u>BACKGROUND</u>

Prysm is a consulting firm that assists universities across the globe to implement online educational and professional programs. (<u>See</u> Am. Compl. ¶¶ 6, 56.) Emeritus Singapore and Emeritus US are subsidiaries of Eruditus Learning Solutions Pte Ltd. ("Eruditus"). (<u>See</u> Dkt. No. 23 at 2.) Although Defendants are distinct legal entities, these companies (along with other Eruditus subsidiaries) publicly operate under the name "Emeritus" and partner with universities worldwide to offer business and educational programs.[2] (<u>See</u> Am. Compl. ¶¶ 6, 11-17; <u>see</u> <u>also</u> Dkt. No. 23 at 16-17.) As relevant here, Defendants and Prysm separately worked with the University of Pennsylvania ("Wharton") to develop and market online educational programs. (<u>See</u> Am. Compl. ¶¶ 74-75.)

In 2022, Prysm began considering the possibility of being acquired by another entity or securing capital investment to permit further expansion. (<u>See</u> <u>id.</u> ¶ 62.) In August 2022, Prysm hired investment bank D.A. Davidson & Co.

---

[2] The Emeritus website indicates that Emeritus also has subsidiaries in Mexico, India, Brazil, the United Arab Emirates, and the United Kingdom. (<u>See</u> Am. Compl. ¶¶ 13-14, 37-40 (citing Emeritus website); Emeritus Privacy Notice, https://emeritus.org/wp-content/uploads/2024/08/Employees-and-Candidates-Notice.pdf?ref (last visited July 2, 2025).) <u>See</u> <u>Orozco v. Fresh Direct, LLC</u>, No. 15 Civ. 8226, 2016 WL 5416510, at *1 n.1 (S.D.N.Y. Sept. 27, 2016) (where the complaint incorporates a website by reference, a district court may consider the website in its totality in adjudicating a motion to dismiss).

("D.A. Davidson") to assist with a potential acquisition or capital raise. (See id. ¶¶ 3, 63.) In the following months, Prysm and D.A. Davidson prepared a highly confidential presentation (the "CIP") to be shared with potential acquirers and investors, which contained Prysm's investment highlights, growth strategies, company operations, and financials. (See id. ¶¶ 64-67.) Given the highly confidential nature of the CIP, any potential acquirer or investor was required to sign an NDA before receiving the presentation. (See id. ¶ 68.)

The NDA stated that, in connection with a possible business transaction between the parties, the recipient ("Recipient") of Prysm's confidential information could share the information only with its employees or affiliates (the "Representatives") if the Representatives (1) needed to know the confidential information to evaluate the potential business transaction, (2) knew of the NDA's existence and terms, and (3) were bound by confidentiality obligations no less protective than the NDA. (See id. ¶ 69; "NDA," Dkt. No. 18-10 at 2.[3]) The Recipient of the confidential information was required to safeguard the information from unauthorized access, use, or disclosure and was required to notify Prysm

---

[3] For the sake of clarity, the Court cites to the ECF page numbers for all exhibits appended to the Amended Complaint.

of any unauthorized use or disclosure. (See NDA at 2.) The Recipient would be responsible for any breach of the NDA by its Representatives. (See id.)

On October 17, 2022, Prysm and Emeritus Singapore executed the NDA in order to discuss a potential acquisition or investment. (See Am. Compl. ¶ 81; see also NDA at 4.) Gabriel Lee ("Lee") signed the NDA on behalf of Emeritus Singapore. (See NDA at 4.) At all relevant times, Prysm was unaware that Emeritus comprised different entities and believed that any Emeritus employee was an employee of Emeritus Singapore, the signatory of the NDA. (See Am. Compl. ¶¶ 15-19.)

On October 19, 2022, Prysm scheduled a virtual meeting for October 27, 2022, with D.A. Davidson and Emeritus (the "October 27th Meeting") to discuss a potential business transaction. (See Dkt. No. 18-2 at 2-4.) Prysm emailed the meeting invitation to Emeritus employees Subham Bansal ("Bansal"), Siddharth Taparia ("Taparia"), and Pranjal Kumar ("Kumar"), who attended the meeting on behalf of Emeritus.[4] (See id. at 2; Am. Compl. ¶ 21.) Although Taparia shared the invitation with Mike Malefakis ("Malefakis") and Charles

---

[4] Based on the allegations in the Amended Complaint, it is unclear whether Bansal, Taparia, and Kumar – who reside in India - are employees of Emeritus US, Emeritus Singapore, or another Emeritus subsidiary. (See Am. Compl. ¶¶ 21, 24, 51.)

Schilling ("Schilling") – employees of Emeritus US – neither Malefakis nor Schilling could attend. (See Am. Compl. ¶¶ 22, 33.)

During the October 27th Meeting, D.A. Davidson presented a condensed version of the CIP and detailed Prysm's business model, financials, competitive strategies, client details, and future growth prospects. (See id. ¶¶ 20-21, 84-85.) Following the October 27th Meeting, D.A. Davidson sent the full version of the CIP via email to all attendees. (See id. ¶¶ 85-86.) D.A. Davidson also sent the CIP to Schilling, but not Malefakis. (See id. ¶ 33; see also Dkt. No. 18-5.)

Lee and Malefakis subsequently led the confidential negotiations with Prysm regarding a possible business transaction. (See Am. Compl. ¶ 46.) At an unspecified time, Defendants declined to acquire and/or invest in Prysm. (See id. ¶ 91.)

Separately, in January 2023, Prysm sent Wharton an invoice for services rendered between October 2021 and December 2022 (the "Charge Report"), which totaled nearly $8.5 million. (See id. ¶ 92; Dkt. No. 18-12 at 21.) Wharton immediately disagreed with various fees in the Charge Report. (See Am. Compl. ¶ 95; Dkt. No. 18-12 at 19-22.) To avoid paying Prysm's requested fees, Wharton asked several unnamed vendors, as well as Defendants, for confidential information

about Prysm to use as leverage in the invoice dispute. (See Am. Compl. ¶ 96.) In response, Emeritus shared the CIP with Wharton. (See id. ¶ 98.) In exchange for the CIP, Wharton gave Defendants Prysm's work product and materials for courses on blockchain technology, green technology, and the metaverse. (See id. ¶¶ 198, 204.)

On February 7, 2023, Wharton terminated its contract with Prysm (the "Wharton Contract" or the "Contract"), claiming that Prysm had violated the Contract's intellectual property provision by using Wharton's trademark in its pitch materials to potential investors and acquirers, which was grounds for an immediate for-cause termination of the Contract. (See id. ¶ 104; see also Dkt. No. 18-14 at 2-5.) Based on the immediate termination, Wharton demanded that Prysm pay all outstanding fees within thirty days. (See Dkt. No. 18-14 at 5-7.) In support of this demand, Wharton asserted that Prysm's Charge Report contradicted the Contract's gross revenue provision and that, based on Wharton's corrected invoice, Prysm owed Wharton nearly $3 million in fees. (See Am. Compl. ¶¶ 107, 113-14; Dkt. No. 18-14 at 5-10.) Prysm immediately suspected that a potential acquirer or investor had shared Prysm's confidential pitch materials with Wharton, as these materials had been shared with a few companies. (See Am. Compl. ¶¶ 106, 119.)

In March 2023, Prysm filed suit against Wharton for breach of contract. See Prysm Group, LLC v. Trustees of the Univ. of Pa. et al., No. 23 Civ. 995 (E.D. Pa.) (the "EDPA Action").[5] On December 14, 2023, during discovery in the EDPA Action, Prysm deduced that Defendants had shared the CIP with Wharton. (See Am. Compl. ¶¶ 120-21.) Prysm later concluded, upon information and belief, that Malefakis was responsible for sharing the CIP with Wharton. (See id. ¶ 99.)

On December 6, 2024, Prysm commenced this action against Emeritus Singapore, d/b/a Emeritus US, alleging breach of contract. (See Dkt. Nos. 1, 3.) In accordance with this Court's Individual Practices, the parties exchanged pre-motion letters in anticipation of a motion to dismiss. In their pre-motion letter, Defendants argued that the single defendant named in the Complaint - Emeritus Singapore, d/b/a Emeritus US – did not legally exist because Emeritus Singapore and Emeritus US are legally distinct entities. (See Dkt. No. 23 at 1-2.) In response, Prysm filed the Amended Complaint, which named Emeritus Singapore and Emeritus US as separate defendants and added eight causes of action. (See generally Am. Compl.) The parties subsequently exchanged pre-motion

---

[5] Prysm initially sued Wharton in the Philadelphia Court of Common Pleas, but Wharton successfully removed the action to the United States District Court for the Eastern District of Pennsylvania. (See Am. Compl. ¶ 117 n.2.) At the time of this Decision and Order, the EDPA Action remains pending.

letters regarding Defendants' motion to partially dismiss the
Amended Complaint. (<u>See</u> <u>generally</u> Defs.' Mot.; "Pl.'s Opp'n,"
Dkt. No. 25; Defs.' Reply.) The parties agreed to deem the
pre-motion letters as a fully briefed motion to dismiss and
granted consent for the Court to rule on the basis of those
letters. (<u>See</u> Dkt. No. 22.)

## II.   <u>STANDARD OF REVIEW</u>

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>,
556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>,
550 U.S. 544, 570 (2007)). A claim is plausible if the
complaint states "enough fact to raise a reasonable
expectation that discovery will reveal evidence of illegal'
conduct" — there is not "a probability requirement at the
pleading stage." <u>Lynch v. City of New York</u>, 952 F.3d 67, 75
(2d Cir. 2020) (quoting <u>Twombly</u>, 550 U.S. at 556); <u>see</u> <u>Iqbal</u>,
556 U.S. at 678 ("A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged."). "In other words, a complaint
should not be dismissed when the factual allegations
sufficiently 'raise a right to relief above the speculative
level.'" <u>Liboy v. Russ</u>, No. 22 Civ. 10334, 2023 WL 6386889,

at *4 (S.D.N.Y. Sept. 29, 2023) (quoting <u>Twombly</u>, 550 U.S. at 555).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." <u>Goldstein v. Pataki</u>, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). The Court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." <u>Garcia v. Lewis</u>, No. 05 Civ. 1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005).

### III. <u>DISCUSSION</u>

Prysm brings nine claims under New York law alleging a breach of the NDA by Defendants and a quid pro quo between Defendants and Wharton. Prysm alleges that Defendants obtained Prysm's confidential information with the goal of harming Prysm as a competitor. Defendants subsequently shared the CIP with Wharton in breach of the NDA and, in exchange, Wharton gave Defendants Prysm's work product and course materials, which Prysm claims Defendants are now improperly using for their own courses.

9

Defendants do not seek dismissal of the claims for breach of contract (Count I) or unjust enrichment (Count VII) but move to dismiss the remaining seven counts for failure to state a claim. (See Dkt. Nos. 24, 26.) Prysm's remaining claims are as follows: (1) tortious interference with the NDA (Count II),[6] (2) tortious interference with the Wharton Contract (Count III), (3) fraudulent concealment (Count V), (4) fraudulent inducement (Count VI),[7] (5) conversion (Count VIII), (6) misappropriation of trade secrets (Count IX), and (7) civil conspiracy (Count IV). Prysm maintains that the claims for tortious interference, fraud, and civil conspiracy are pleaded in the alternative in case the Court concludes that Defendants are not alter egos. The Court does not reach the question of whether Defendants are alter egos because, for the reasons explained below, the Court finds that the seven tort claims must be dismissed for failure to state a claim.

---

[6] Prysm's tortious interference claim regarding the NDA (Count II) is asserted only against Emeritus US. The remaining claims at issue in this Decision and Order are alleged against both Defendants.

[7] In their briefing, Defendants state that the fraudulent inducement claim is Count VII, (see Defs.' Mot. at 3; Defs.' Reply at 3), even though Count VII is the unjust enrichment claim. (See Am. Compl. at 27.) Based on the substance of Defendants' briefing, Defendants evidently seek to dismiss the fraudulent inducement claim (Count VI), not the unjust enrichment claim (Count VII).

A.   <u>TORTIOUS INTERFERENCE WITH NDA</u>

Prysm claims that Emeritus US tortiously interfered with the NDA between Prysm and Emeritus Singapore, but it is unclear which theory Prysm intends to invoke: (1) tortious interference with a contract or (2) tortious interference with prospective economic advantage. (<u>See</u> Defs.' Mot. at 1-2; Pl.'s Opp'n at 1-2.) However, the difference is of no consequence: Prysm has failed to plead facts sufficient to maintain either cause of action.

1.   <u>Tortious Interference with a Contract</u>

Prysm alleges that Emeritus US convinced Emeritus Singapore not to invest in and/or acquire Prysm in violation of the NDA. (<u>See</u> Am. Compl. ¶ 151.) Under New York law, the elements of tortious interference with a contract are (1) "the existence of a valid contract between the plaintiff and a third party," (2) the "defendant's knowledge of the contract," (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification," (4) "actual breach of the contract," and (5) damages. <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting <u>Lama Holding Co. v. Smith Barney Inc.</u>, 668 N.E.2d 1370, 1375 (N.Y. 1996)). Failure to plead any of these elements warrants dismissal of the tortious interference claim. <u>See</u> <u>Generation Next Fashions Ltd. v. JP</u>

<u>Morgan Chase Bank, NA.</u>, 698 F. Supp. 3d 663, 683 (S.D.N.Y. 2023).

The parties do not dispute that Emeritus US knew that the NDA was a valid contract between Prysm and Emeritus Singapore or that Emeritus US was aware of the NDA's terms. (<u>See</u> Am. Compl. ¶¶ 19, 32.) However, Prysm has failed to allege the elements of intentional procurement and an actual breach of the NDA.

First, Prysm has not alleged any facts suggesting that Emeritus US directed Emeritus Singapore not to invest in and/or acquire Prysm. <u>See</u> <u>Clean Coal Techs., Inc. v. Leidos, Inc.</u>, 377 F. Supp. 3d 303, 320 (S.D.N.Y. 2019) (plaintiff failed to allege procurement because there were no factual allegations that the third party directed, commanded, or set in motion the defendant's alleged breach). Rather, the Amended Complaint alleges that Lee of Emeritus Singapore and Malefakis of Emeritus US jointly led the negotiations regarding a potential transaction and Defendants ultimately declined to consummate an acquisition or investment. (<u>See</u> Am. Compl. ¶¶ 46, 91.) Essentially, Prysm asserts that Defendants worked together to evaluate, and ultimately decline, a potential business transaction with Prysm. Thus, Prysm's allegation that Emeritus US directed Emeritus Singapore to breach the NDA is too conclusory and speculative to support

a tortious interference claim. <u>See</u> <u>Manbro Energy Corp. v.</u> <u>Chatterjee Advisors, LLC</u>, No. 20 Civ. 3773, 2021 WL 2037552, at *7 (S.D.N.Y. May 21, 2021) (rejecting unsupported allegation that third-party defendants "intentionally and without justification orchestrated the scheme" to have defendants breach the contract as "conclusory and not entitled to be assumed true" (citations omitted)); <u>TileBar v.</u> <u>Glazzio Tiles</u>, 723 F. Supp. 3d 164, 202-03 (E.D.N.Y. 2024) (unsupported allegation that the third-party defendant encouraged and conspired with defendants to breach the NDA with plaintiff was overly conclusory). Thus, Prysm has failed to allege that Emeritus US intentionally procured Emeritus Singapore's decision to decline a business transaction with Prysm.

Second, Prysm has failed to allege an actual breach of the NDA. <u>See</u> <u>Generation Next Fashions Ltd.</u>, 698 F. Supp. 3d at 683. The NDA did not require Emeritus Singapore to invest in and/or acquire Prysm. (<u>See</u> NDA at 2.) Rather, the NDA was meant to protect Prysm's confidential information while the parties evaluated a possible business transaction. (<u>See</u> <u>id.</u>) Nor does Prysm attempt to identify any provision of the NDA that was allegedly breached because the parties did not consummate a business transaction. <u>See</u> <u>Henry v. Fox News</u> <u>Network LLC</u>, 629 F. Supp. 3d 136, 152 (S.D.N.Y. 2022)

(plaintiff asserting a tortious interference claim "must identify what provisions of the contract were breached as a result of the acts at issue" (citation omitted)). Thus, Prysm cannot maintain a claim for tortious interference with a contract.

     2.   <u>Tortious Interference with Prospective Economic Advantage</u>

Prysm also alleges that Emeritus US convinced Emeritus Singapore to breach the NDA to harm Prysm as a competitor. (<u>See</u> Am. Compl. ¶ 151; <u>see</u> <u>also</u> Pl.'s Opp'n at 2.) To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege that (1) "it had a business relationship with a third party," (2) "the defendant knew of that relationship and intentionally interfered with it," (3) "the defendant acted solely out of malice, or used dishonest, unfair, or improper means," and (4) "the defendant's interference caused injury to the relationship." <u>Camelot SI, LLC v. ThreeSixty Brands Grp. LLC</u>, 632 F. Supp. 3d 471, 482 (S.D.N.Y. 2022) (citation omitted). Failure to allege any of these elements warrants dismissal of the tortious interference claim. <u>See</u> <u>id.</u> at 482-83.

Prysm's claim for tortious interference with prospective economic advantage suffers several deficiencies. Prysm's conclusion that Emeritus US persuaded Emeritus Singapore to

share the CIP with Wharton is not supported by the factual allegations in the Amended Complaint. See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."). The Amended Complaint alleges that Malefakis - an Emeritus US employee who had ties to Wharton - was responsible for sharing the CIP with Wharton. (See Am. Compl. ¶¶ 99-100, 120-21.) There are no allegations suggesting that an Emeritus Singapore employee was involved in sharing the CIP with Wharton, let alone that Emeritus US convinced Emeritus Singapore to share the CIP with Wharton.

Further, Prysm fails to allege that Emeritus US acted solely out of malice or used dishonest, unfair, or improper means, which requires allegations that the "defendant engaged in conduct for the sole purpose of inflicting intentional harm on plaintiff[]," or that the defendant's conduct "amount[s] to a crime or an independent tort, such as fraud or misrepresentation." Boehner v. Heise, 734 F. Supp. 2d 389, 405 (S.D.N.Y. 2010) (citation omitted). Here, Prysm merely alleges that Emeritus US persuaded Emeritus Singapore to violate the NDA so that Emeritus US could gain an unfair advantage over Prysm as a competitor. (See Am. Compl. ¶¶ 153-55.) As discussed above, Prysm's persuasion allegations are

overly conclusory. But even if adequately pleaded, allegations of mere persuasion are insufficient to allege malice or improper means. See Fifth St. Fin. Corp. v. Toll, No. 12 Civ. 5896, 2013 WL 3757037, at *3 (S.D.N.Y. July 17, 2013) ("[P]ersuasion alone, even when knowingly directed at a specific business relationship, is not enough" to allege tortious interference). Thus, Prysm has failed to state a claim for tortious interference with prospective economic advantage.

Accordingly, Prysm's claim for tortious interference with the NDA (Count II) is **DISMISSED**.

B.   TORTIOUS INTERFERENCE WITH WHARTON CONTRACT

Prysm alleges that Defendants tortiously interfered with the Wharton Contract because Emeritus US convinced Emeritus Singapore to share the CIP with Wharton and, in turn, Wharton used the CIP as justification to terminate the Wharton Contract. (See Am. Compl. ¶¶ 158-61.) As explained above, Prysm has not alleged facts supporting its theory that Emeritus US convinced Emeritus Singapore to breach the NDA. Further, Prysm cannot sustain this tortious interference claim because Prysm has failed to allege that Defendants were the "but for" cause of Wharton's termination of the Wharton Contract.

In addition to the elements discussed above, a plaintiff must allege causation to sustain a claim for tortious interference with a contract. <u>See</u> <u>Clean Coal Techs., Inc.</u>, 377 F. Supp. 3d at 319. "[I]n order to show causation, plaintiff must specifically allege that there would not have been a breach but for the actions of defendants." <u>Balance Point Divorce Funding, LLC v. Scrantom</u>, 978 F. Supp. 2d 341, 349 (S.D.N.Y. 2013). However, if a "third-party was predisposed toward breaching the contract even in the absence of the alleged interference, a plaintiff cannot establish 'but for' causation." <u>RSM Prod. Corp. v. Fridman</u>, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009).

Prysm argues that Defendants were necessarily the "but for" cause of Wharton's breach because Wharton used the CIP to justify its immediate termination of the Contract. (<u>See</u> Pl.'s Opp'n at 2-3.) Prysm's position is not persuasive. The allegations in the Amended Complaint make clear that Wharton was determined to avoid its contractual obligations to pay Prysm's requested fees before Defendants shared the CIP with Wharton. (<u>See</u> Am. Compl. ¶¶ 95-96, 98.) Indeed, Wharton asked several vendors, including Defendants, for information on Prysm in hopes of gaining leverage in the financial dispute. (<u>See</u> <u>id.</u> ¶¶ 95-96.) In response to Wharton's request, Defendants sent Wharton the CIP. (<u>See</u> <u>id.</u> ¶ 98.) Moreover,

the appended email correspondence between several Wharton employees reinforces the conclusion that upon receiving the Charge Report, Wharton was immediately determined to dispute Prysm's requested fees. (See Dkt. No. 18-12 at 19-22.) Within hours of receiving the Charge Report, Wharton employees wrote that Prysm's requested fees were "absurd" and "outrageous" and that the Charge Report "seem[ed] like an immediate lawsuit." (See id.)

Given Wharton's independent predisposition toward breaching the Contract, Prysm has failed to establish "but for" causation. See Clean Coal Techs., Inc., 377 F. Supp. 3d at 319 (dismissing tortious interference claim where the defendant had made an independent decision to breach the contract, even though the decision "may have been eased by certain actions taken by [other defendants]"); RSM Prod. Corp., 643 F. Supp. 2d at 410 (dismissing tortious interference claim where the complaint "allege[d] that [the third party] exhibited a predisposition toward breaching the Agreement independent of the alleged involvement of any of the Defendants").

For the reasons explained above, Prysm's claim for tortious interference with the Wharton Contract (Count III) is **DISMISSED**.

C.    <u>FRAUD CLAIMS</u>

Prysm also brings claims for fraudulent inducement and fraudulent concealment. Prysm alleges that (1) Defendants fraudulently induced Prysm into signing the NDA by representing that they were a consolidated entity, and (2) Defendants fraudulently concealed that they were separate companies after Prysm and Emeritus Singapore executed the NDA. (<u>See</u> Am. Compl. ¶¶ 173-95.) According to Prysm, Defendants intentionally misrepresented or concealed their corporate structure so that Emeritus US could obtain Prysm's confidential information to harm Prysm as a competitor. (<u>See</u> <u>id.</u> ¶¶ 179, 188-91.) And ultimately, Emeritus US shared the CIP with Wharton, which was detrimental to Prysm. (<u>See</u> <u>id.</u> ¶¶ 179, 191.) Defendants argue that both fraud claims must be dismissed as duplicative of the breach of contract claim. (<u>See</u> Defs.' Mot. at 3.) Given the similarities between these types of fraud claims, the Court first outlines the relevant legal standards before addressing Prysm's claims for fraudulent inducement and fraudulent concealment, respectively.

To state a claim for fraudulent inducement under New York law, a plaintiff must allege that (1) the defendant made a materially false representation, (2) the defendant intended to defraud the plaintiff, (3) the plaintiff reasonably relied

on the representation, and (4) resulting damages. See Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 528 (S.D.N.Y. 2001). To state a claim for fraudulent concealment, a plaintiff must allege (1) the same elements for fraudulent inducement and (2) that the defendant had a duty to disclose a material fact but failed to do so. See UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003).

Both types of fraud claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). See Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 22 (S.D.N.Y. 2009). Under Rule 9(b), a plaintiff must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Nasik Breeding & Rsch. Farm Ltd., 165 F. Supp. 2d at 528 (citation omitted). Ultimately, "[m]isrepresentations or omissions must be pleaded with specificity or the claims will be dismissed." Ferring B.V. v. Allergan, Inc., 932 F. Supp. 2d 493, 511 (S.D.N.Y. 2013).

1.  Fraudulent Inducement

At the outset, the Court rejects Defendants' argument that the fraudulent inducement claim is duplicative of the breach of contract claim. "[A] claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007); see also Vinci Brands LLC v. Coach Servs., Inc., No. 23 Civ. 5138, 2024 WL 4370841, at *6 (S.D.N.Y. Oct. 2, 2024) ("[A] fraud claim that is premised on a misrepresentation which induced the plaintiff to enter into the contract is collateral to a breach-of-contract claim.").

Regarding the merits, Prysm alleges that Defendants misrepresented their corporate structure to induce Prysm to sign the NDA. Prysm maintains that it would not have executed the NDA if it had known that Emeritus Singapore was merely pretending to conduct operations in the United States and that Emeritus US, a non-signatory, would not be bound by the NDA.[8] (See Am. Compl. ¶¶ 189, 193-94.) For the reasons

---

[8] Although Prysm represents that Emeritus US was not bound by the NDA, this framing is imprecise. As an affiliate of Emeritus Singapore, Emeritus US was required to abide by the terms of the NDA and safeguard Prysm's confidential information. (See NDA at 2.) However, the NDA specifies that if an affiliate of Emeritus Singapore breached the NDA, Emeritus Singapore would be liable for the affiliate's breach. (See id.) Given that Prysm seeks to hold both Emeritus Singapore and Emeritus US liable for the alleged breach, Prysm's position appears to be that it would not have signed the NDA if it had known that only Emeritus Singapore – not Emeritus

explained below, the Court finds that Prysm cannot sustain a fraudulent inducement claim because (1) Prysm's conclusory allegations regarding Emeritus Singapore's business in the United States are contradicted by specific facts in the Amended Complaint, (2) Prysm has failed to allege fraudulent intent, and (3) Prysm's allegations fall short of the Rule 9(b) heightened pleading standard.

First, Prysm's allegation that Emeritus Singapore was merely pretending to do business in the United States is conclusory and contradicted by specific allegations in the Amended Complaint. (See Am. Compl. ¶ 189.) See Hirsch, 72 F.3d at 1092. As Prysm acknowledges, that Emeritus Singapore signed the NDA to potentially acquire Prysm, an American company, shows that Emeritus Singapore was involved in at least some operations in the United States. (See Am. Compl. ¶ 187.) Moreover, Lee of Emeritus Singapore was involved in the negotiations with Prysm regarding a potential business transaction. (See id. ¶ 46.) The Amended Complaint also alleges that Emeritus Singapore and Emeritus US each offered online courses with Wharton, an American university, and includes the corresponding billing records. (See id. ¶ 52; see also Dkt. No. 18-9 at 2-3.) Ultimately, Prysm's factual

---

US – would be liable for a breach of the NDA cause by an Emeritus US employee.

allegations show that Emeritus Singapore actually did
business in the United States.

Second, Prysm has failed to allege that Defendants had
the requisite fraudulent intent. Prysm argues that Defendants
misrepresented that they were separate entities to induce
Prysm into signing the NDA so that Emeritus US could gain a
competitive advantage. But to state a claim for fraudulent
inducement, a plaintiff "must allege facts that give rise to
a strong inference of fraudulent intent." President Container
Grp. II, LLC v. Systec Corp., 467 F. Supp. 3d 158, 167
(S.D.N.Y. 2020) (quoting Acito v. IMCERA Grp., Inc., 47 F.3d
47, 52 (2d Cir. 1995)). Accordingly, a plaintiff must either
(1) "alleg[e] facts to show that defendants had both motive
and opportunity to commit fraud," or (2) "alleg[e] facts that
constitute strong circumstantial evidence of conscious
misbehavior or recklessness." Trodale Holdings LLC v. Bristol
Healthcare Invs. L.P., No. 16 Civ. 4254, 2018 WL 2980325, at
*3 (S.D.N.Y. June 14, 2018) (quoting Lerner v. Fleet Bank,
N.A., 459 F.3d 273, 290-291 (2d Cir. 2006)).

As a general matter, Prysm's allegations that Defendants
intentionally concealed their corporate structure to induce
Prysm to sign the NDA are too conclusory to allege fraudulent
intent. (See Am. Compl. ¶¶ 191, 194.) See Dash v. Seagate
Tech. (U.S.) Holdings, Inc., 27 F. Supp. 3d 357, 362 (E.D.N.Y.

2014) (no fraudulent intent where plaintiff "conclusorily allege[d] that Defendant intentionally concealed and failed to disclose the true facts" about its product "for the purpose of inducing" plaintiff to purchase the product (citation omitted)).

Moreover, it is well established that "[a]llegations that defendants stand[] to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." See PetEdge, Inc. v. Garg, 234 F. Supp. 3d 477, 495 (S.D.N.Y. 2017) (citation omitted). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Bigsby v. Barclays Cap. Real Estate, Inc., 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)); see also ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P., 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) (allegations of economic gain are insufficient under Rule 9(b) because otherwise, "virtually every corporation in the United States could be subject to fraud allegations" (citation omitted)). Accordingly, Prysm's generalized allegations of competitive advantage are insufficient to show that Defendants had motive and

opportunity to commit fraud prior to executing the NDA. See PetEdge, Inc., 234 F. Supp. 3d at 494-95.

The factual allegations in the Amended Complaint also do not support a strong inference that Emeritus Singapore signed the NDA with the goal of harming Prysm. To determine whether a plaintiff has stated facts that give rise to a strong inference of fraudulent intent, the Court must consider the Amended Complaint in its entirety and account for plausible opposing inferences. See Silvercreek Mgmt., Inc. v. Citigroup, Inc., 248 F. Supp. 3d 428, 438-39 (S.D.N.Y. 2017). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Id. (quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 176-77 (2d Cir. 2015)).

According to the Amended Complaint, Emeritus Singapore signed the NDA because it was interested in acquiring Prysm, a small company with a superior strategy and domain experience that was rapidly growing in the same market. (See Am. Compl. ¶ 78.) Given that Prysm and Emeritus were competitors, Prysm alleges that both parties understood the importance of the NDA and readily agreed to comply with its terms. (See id. ¶ 6.) However, several months after the NDA was executed, Wharton approached Defendants requesting information on Prysm

and Defendants seized the opportunity by sharing the CIP with Wharton. (See id. ¶¶ 92, 96, 98.) These facts support the plausible inference that Defendants were enticed by the quid pro quo with Wharton once the NDA was in force, not Prysm's theory that Defendants had motive to commit fraud prior to executing the NDA. See Vining v. Oppenheimer Holdings Inc., No. 08 Civ. 4435, 2010 WL 3825722, at *13-14 (S.D.N.Y. Sept. 29, 2010) (no strong inference of fraudulent intent where an opposing explanation for defendant's conduct was more plausible than plaintiff's theory that the defendant intended to deceive investors).

Nor does Prysm point to any facts suggesting conscious misbehavior or recklessness at the time that Defendants made the alleged misrepresentations. "Where a complaint fails to allege motive, the strength of circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." Id. at *8 (citation omitted). Conscious misbehavior entails "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (citations omitted). Prysm does not plead any facts, nor does it suggest in its briefing, that Defendants engaged in deliberate illegal behavior by representing that

26

they were a consolidated entity. See In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 534-35 (S.D.N.Y. 2009).

To allege recklessness, a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Zappin v. Comfort, No. 18 Civ. 01693, 2022 WL 6241248, at *16 (S.D.N.Y. Aug. 29, 2022) (quoting Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)); see In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76-77 (2d Cir. 2001) (defendant's public representations that book sales were increasing and returns were decreasing, despite knowledge that sales were actually declining and returns were rapidly rising, was reckless). "[R]ecklessness is a state of mind approximating actual intent, and not merely a heightened form of negligence." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 407 (S.D.N.Y. 2010) (citation omitted).

However, a plaintiff cannot establish recklessness "through hindsight evaluations of a defendant's conduct." Zech Cap. LLC v. Ernst & Young Hua Ming, 636 F. App'x 582, 585 (2d Cir. 2016). Here, Prysm's allegations amount to a hindsight evaluation of Defendants' conduct. Prysm alleges that prior to executing the NDA, Defendants misrepresented themselves as Emeritus so that Emeritus US could harm Prysm as a competitor in the US market, as evidenced by Emeritus US

sharing the CIP with Wharton after the NDA was executed. (See Am. Compl. ¶¶ 95-96, 98-99, 188, 190-91, 194.) Prysm does not point to any other allegations that create a strong inference of highly unreasonable conduct or an extreme departure from the standard of ordinary care at the time the NDA was executed. Accordingly, Prysm fails to plead circumstantial allegations of recklessness.

Third, Prysm's allegations regarding Defendants' misleading representations do not meet the specificity requirements of Rule 9(b). Prysm alleges that D.A. Davidson informed Prysm that Emeritus was interested in acquiring and/or investing in Prysm and had signed the NDA. (See id. ¶ 4-6, 185.) Based on this representation from D.A. Davidson,[9] Prysm assumed that Emeritus meant Emeritus US, even though the Emeritus signatory had a Singaporean address. (See id. ¶ 185-86.)

However, Rule 9(b) requires a plaintiff to specify "the who, what, when, where, and how: the first paragraph of any newspaper story." PetEdge, Inc., 234 F. Supp. 3d at 490

---

[9] That Defendants communicated the alleged misrepresentation through D.A. Davidson does not foreclose a fraud claim. See Silivanch v. Celebrity Cruises, Inc., 171 F. Supp. 2d 241, 273 (S.D.N.Y. 2001) ("[W]here a defendant makes a false statement to a third party acting as a proxy for the plaintiff, the plaintiff may assert a fraud claim directly against that defendant."). Nonetheless, that a misleading statement was communicated through a third party does not dispense with the heightened pleading requirements of Rule 9(b). See Red Mountain Med. Holdings, Inc. v. Brill, 563 F. Supp. 3d 159, 174 (S.D.N.Y. 2021).

(citation omitted). That "Emeritus" made the misleading statements is too generalized under Rule 9(b): "In cases with multiple defendants, however, Rule 9(b) requires that a complaint allege facts specifying each defendant's contribution to the fraud." Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 249 (S.D.N.Y. 2011); see also Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").

Prysm's allegation that Lee, Malefakis, Schilling, Bansal, Taparia, and Kumar were involved in perpetrating the fraud fares no better. (See Am. Compl. ¶¶ 192-93.) Merely listing the names of Emeritus employees, without further information, does little to render the allegations more specific. See Optima Media Grp. Ltd. v. Bloomberg L.P., 383 F. Supp. 3d 135, 143 (S.D.N.Y. 2019). To the extent that Prysm attributes the alleged misrepresentations to any or all of these individuals, Rule 9(b) requires Prysm to identify the specific statements made by each individual and how each of those statements was made. See Bombardier Cap., Inc. v. Naske Air GmbH, No. 02 Civ. 10176, 2003 WL 22137989, at *3 (S.D.N.Y. Sept. 17, 2003); see also Optima Media Grp. Ltd., 383 F. Supp. 3d at 144 ("[Plaintiff's] failure to specify the speakers is

problematic in itself . . . Taken in conjunction with the failure to specify the location, method of communication, and precise time frame, [Plaintiff's] claim cannot satisfy Rule 9(b).").

Prysm also does not identify when the purportedly misleading statements were made, alleging only that the fraudulent communications occurred in the months leading up to the October 27th Meeting. (See Am. Compl. ¶¶ 63, 79-80, 170.) Identifying a general time frame is insufficient under Rule 9(b). See CapLOC, LLC v. McCord, No. 17 Civ. 5788, 2018 WL 3407708, at *10 (S.D.N.Y. June 12, 2018) (that representations were made over the course of several months was insufficient under Rule 9(b) where plaintiff "fail[ed] to say when, where, by whom, and whether [the statements were made] in person, over the phone, or by email"). Given these various deficiencies, Prysm falls short of alleging facts with sufficient particularity as required by Rule 9(b).

Thus, for the reasons explained above, Prysm's claim for fraudulent inducement (Count VI) is **DISMISSED**.

2.  Fraudulent Concealment

In support of its fraudulent concealment claim, Prysm alleges that Defendants made misrepresentations and omissions about the Emeritus corporate structure during the October 27th Meeting and associated correspondence. (See Am. Compl.

¶¶ 176, 178.) Prysm's theory is that Defendants concealed their corporate structure so that Emeritus US, as an affiliate, would not be liable for its anticipated misuse of Prysm's confidential information. (See id. ¶ 179.)

Although a closer question, the Court finds that Prysm's fraudulent concealment claim is not duplicative of the breach of contract claim. Defendants are correct that, as a general rule, a fraud claim premised solely on the basis of a breach of contract claim will be dismissed as redundant. See Spinelli v. NFL, 903 F.3d 185, 209 (2d Cir. 2018). "Despite this general rule, fraud and breach of contract claims can coexist in certain circumstances." Trodale Holdings LLC, 2018 WL 2980325, at *4. To maintain a separate fraud claim, a plaintiff must (1) "demonstrate a legal duty separate from the duty to perform under the contract," (2) "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract," or (3) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Kitchen Winners NY Inc. v. Rock Fintek LLC, 668 F. Supp. 3d 263, 290-91 (S.D.N.Y. 2023) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)). Where a "fraud claim satisfies one of the[se] [three] scenarios, there is no need to address the other ones."

Subramanian v. Lupin, Inc., No. 17 Civ. 5040, 2020 WL 7029273, at *13 (S.D.N.Y. Aug. 21, 2020).

Here, Prysm alleges that Defendants' failure to disclose their corporate structure constitutes a fraudulent misrepresentation extraneous to the NDA. "Misrepresentations of present facts made post-contract formation are collateral or extraneous to the contract and are actionable in fraud." Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016); see also Xeriant, Inc. v. XTI Aircraft Co., 762 F. Supp. 3d 345, 355 (S.D.N.Y. 2025) ("[A] misrepresentation of present facts, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract." (citation omitted)). To determine whether a fraudulent representation is collateral or extraneous to the contract, "the primary consideration . . . is whether the contract itself speaks to the issue." Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 426–27 (S.D.N.Y. 2004); see also PetEdge, Inc., 234 F. Supp. 3d at 492 (defining "collateral" as "something other than what is expressly required by the contract" (citation omitted)).

The Court finds that Defendants' representations and omissions regarding the Emeritus corporate structure constitute a present fact that is collateral to the NDA. The NDA did not require Emeritus Singapore to disclose its

corporate structure or distinguish between itself and its affiliates, even though such a distinction carried different liability implications. The NDA states that (1) Emeritus Singapore was allowed to share Prysm's confidential information with Emeritus Singapore affiliates, subject to certain criteria, for the purpose of evaluating a potential business transaction, and (2) Emeritus Singapore would be liable for the affiliate's breach. (See NDA at 2.) Thus, under the NDA, Defendants were not required to disclose whether they were separate entities in order to access or use Prysm's confidential business information. However, Prysm insists that it would not have signed the NDA as written if it had known that Emeritus US could not be held liable under the NDA. (See Am. Compl. ¶ 189.) Accordingly, the Court will not dismiss Prysm's fraudulent concealment claim as duplicative of the breach of contract claim.

Although not duplicative, Prysm's fraudulent concealment claim is flawed in several respects. The deficiencies largely overlap with those identified above pertaining to the fraudulent inducement claim. Prysm has failed to allege (1) that Defendants had a duty to disclose their corporate structure, (2) fraudulent intent, and (3) factual allegations meeting the Rule 9(b) heightened pleading standard.

First, Prysm has not sufficiently alleged that Defendants had a duty to disclose that they were separate entities, a requirement specific to fraudulent concealment claims. See UniCredito Italiano SPA, 288 F. Supp. 2d at 497. "New York recognizes a duty by a party to a business transaction to disclose material facts in certain circumstances, including where the party has made a partial or ambiguous statement." Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 244 (S.D.N.Y. 2006). A duty to disclose arises under the "special facts" doctrine where (1) "one party has superior knowledge of certain information," (2) "that information is not readily available to the other party," and (3) "the first party knows that the second party is acting on the basis of mistaken knowledge." UniCredito Italiano SPA, 288 F. Supp. 2d at 497; see also Jana L. v. West 129th St. Realty Corp., 802 N.Y.S.2d 132, 135 (App. Div. 1st Dep't 2005) (under the special facts doctrine, the information must be "peculiarly within the knowledge" of the defendant and not discoverable by the plaintiff through the "exercise of ordinary intelligence" (citations omitted)).

Prysm insists that it could not have known that Defendants were separate entities because the Emeritus website and other press releases did not distinguish between Emeritus subsidiaries. (See Am. Compl. ¶¶ 35-40, 177.)

However, a plaintiff has a duty to investigate where the "plaintiff was placed on guard or practically faced with the facts." <u>Crigger v. Fahnestock & Co.</u>, 443 F.3d 230, 234 (2d Cir. 2006) (citation omitted). Given that the first signatory of the NDA was an Emeritus entity and listed a Singaporean address, (<u>see</u> Am. Compl. ¶¶ 185-86), the Court doubts that the distinction between Emeritus Singapore and Emeritus US was unavailable to Prysm upon reasonable inquiry. <u>See</u> <u>Naughright v. Weiss</u>, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) (no duty to disclose where plaintiff failed to allege that defendants' superior knowledge was unavailable upon reasonable inquiry).

Moreover, there are no factual allegations suggesting that Defendants were aware of Prysm's mistaken belief that Emeritus Singapore and Emeritus US were a single entity. As explained above, under the NDA, Prysm's confidential information could be shared with Emeritus Singapore and its qualifying affiliates, such as Emeritus US, for the purpose of evaluating a potential business transaction with Prysm. (<u>See</u> NDA at 2.) Thus, that Prysm was comfortable sharing its confidential information with Defendants' qualifying employees in connection with the October 27th Meeting is not evidence that Prysm mistakenly believed that any Emeritus employee was an employee of Emeritus Singapore. (<u>See</u> Am.

Compl. ¶ 178.) Accordingly, the Court cannot plausibly infer that Defendants knew that Prysm was acting on the basis of mistaken knowledge. See Kitchen Winners NY Inc., 668 F. Supp. 3d at 291-92; see also Imperatore v. Putnam Lovell NBF Sec. Inc., No. 05 Civ. 4966, 2006 WL 648214, at *4 (S.D.N.Y. Mar. 15, 2006) (special facts doctrine did not apply because "Plaintiff has merely asserted that Defendant had superior knowledge and that Defendant knew Plaintiff was acting upon mistaken knowledge").

Second, as with its fraudulent inducement claim, Prysm has failed to allege fraudulent intent. Prysm alleges that Lee, Malefakis, Schilling, Bansal, Taparia, and Kumar participated in the fraud through statements made during the October 27th Meeting and associated correspondence, which spanned several months. (See Am. Compl. ¶¶ 170, 176, 178, 180.) According to Prysm, all of those individuals made partial and ambiguous statements, including that they all worked at Emeritus but, in order to harm Prysm as a competitor, failed to disclose that there were multiple Emeritus entities. (See id. ¶¶ 176, 179.)

The Court reiterates that "speculation and conclusory allegations will not suffice to support a strong inference of fraudulent intent." Steadman v. Citigroup Glob. Markets Holdings Inc., 592 F. Supp. 3d 230, 248 (S.D.N.Y. 2022)

(citation omitted). Here, there is no indication that Lee, Malefakis, Schilling, Bansal, Taparia, and Kumar represented to Prysm that they were Emeritus employees in order to dupe Prysm into believing that they were all subject to the NDA. Nor is there any support for Prysm's assertion that, during the October 27th Meeting, Bansal, Kumar, and Taparia did not disclose that Emeritus US was not bound by the NDA with the goal of harming Prysm as a competitor. (See Am. Compl. ¶¶ 178-79.)

Moreover, Prysm's allegations that Lee, Malefakis, and Schilling were involved in the fraud through the October 27th Meeting and associated correspondence are not supported by the factual allegations in the Amended Complaint. See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) ("Allegations that are merely conclusory or unsupported by factual allegations cannot meet [the Rule 9(b)] standard." (citation omitted)). Based on the allegations in the Amended Complaint, Lee did not participate in the October 27th Meeting and was not included on any emails related to the October 27th Meeting. (See Am. Compl. ¶¶ 21, 83; see also Dkt. Nos. 18-2, 18-5.) Similarly, Malefakis and Schilling did not participate in the October 27th Meeting. (See Am. Compl. ¶¶ 22, 33.) Although Malefakis and Schilling were included on some emails related

to the October 27th Meeting, (see Dkt. No. 18-2 at 2; Dkt.
No. 18-5 at 2), the Amended Complaint fails to identify any
specific, affirmative representations made by these
individuals that were misleading. The documents appended to
the Amended Complaint do not fill that void: There are no
emails from Schilling, and the email from Malefakis states
that he could not attend the October 27th Meeting. (See Dkt.
No. 18-2 at 2; Dkt. No. 18-5 at 2.)

Lastly, Prysm's fraudulent concealment allegations fall
short of the Rule 9(b) pleading standard. See Yoomi Babytech,
Inc. v. Anvyl, Inc., No. 20 Civ. 7933, 2021 WL 4332258, at
*12 (S.D.N.Y. Sept. 22, 2021). Prysm alleges that Lee,
Malefakis, Schilling, Bansal, Taparia, and Kumar participated
in the fraud – through statements made during the October
27th Meeting and associated correspondence - but does not
provide factual details to support that conclusion. (See Am.
Compl. ¶¶ 176, 178, 180.) See, e.g., Seifts v. Consumer Health
Solutions LLC, 61 F. Supp. 3d 306, 324 (S.D.N.Y. 2014)
(granting a motion to dismiss where plaintiffs failed to plead
"which specific fraudulent statements were made to them, by
whom, or where and when they were made" in a claim that
defendants fraudulently induced plaintiffs to enter into a
contract).

As in the case regarding the fraudulent inducement allegations, Prysm fails to identify the specific statements at issue, who made each statement, and when and where each statement was made. "Conclusory labels of fraud or deception - as opposed to factual allegations concerning particular intentional misrepresentations, made at particular times, by particular people, through particular methods - are legally insufficient" to state a fraudulent inducement claim. Yencho v. Chase Home Fin. LLC, No. 14 Civ. 230, 2015 WL 127721, at *3 (S.D.N.Y. Jan. 8, 2015). As explained above, merely listing the Emeritus employees involved in the alleged fraud is not sufficiently specific under Rule 9(b). That those individuals generally represented that they were Emeritus employees does not satisfy the heightened standard required by Rule 9(b). See Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 324 (S.D.N.Y. 2012) (dismissing fraud claim where plaintiff identified the speakers but gave only a general description of the statements that he alleged were fraudulent and failed to identify when and where the statements were made). Given those various deficiencies, Prysm's fraudulent concealment allegations fall short of pleading facts with sufficient particularity under Rule 9(b).

Thus, for the reasons detailed above, Prysm's fraudulent concealment claim (Count V) is **DISMISSED**.

D.    CONVERSION

Under New York law, "a conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.'" Grgurev v. Licul, 229 F. Supp. 3d 267, 285 (S.D.N.Y. 2017) (quoting Colavito v. New York Organ Donor Network, Inc., 860 N.E.2d 713, 717 (N.Y. 2006)). The elements of conversion are "plaintiff's possessory right or interest in the property" and "defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Grgurev, 229 F. Supp. 3d at 285 (citation omitted). Further, the property at issue must be "a specific identifiable thing," Apple Mortg. Corp. v. Barenblatt, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016) (citation omitted), and the defendant must have "exclude[d] the owner from exercising her rights over the goods." Fischkoff v. Iovance Biotherapeutics, Inc., 339 F. Supp. 3d 408, 414 (S.D.N.Y. 2018) (quoting New York v. Seventh Regiment Fund, Inc., 774 N.E.2d 702, 711 (N.Y. 2002)).

Here, Prysm alleges a quid pro quo between Wharton and Defendants: In exchange for the CIP, Wharton sent Defendants Prysm's work product and materials for courses on blockchain, green technology, and the metaverse. (See Am. Compl. ¶¶ 203-07.) Prysm alleges that Defendants have used or are currently

40

using Prysm's materials for their own courses on these three subjects, which are offered online at other universities. (See id. ¶¶ 206-07.) As a result, Prysm insists that it can no longer use these course materials for its own commercial benefit. (See id. ¶ 210.) However, for the reasons explained below, Prysm has failed to state a conversion claim.

First, Prysm's vague and conclusory allegations regarding Prysm's course materials and work product do not meet the plausibility standard required at the motion to dismiss stage. Prysm does not include any factual descriptions of the work product or course materials at issue, other than that they relate to the topics of blockchain, green technology, and the metaverse. (See id. ¶¶ 205-09.) Further, Prysm does not explain how Defendants' courses are based on Prysm's work product. Although Prysm broadly alleges that Defendants used Prysm's work product in designing, marketing, implementing, and offering those courses, (see id. ¶ 208), Prysm does not point to any similarities between the courses beyond the general topics.

Likewise, the documents appended to the Amended Complaint do not reveal any similarities between Prysm's courses and the courses offered by Defendants. (See Dkt. Nos. 18-16, 18-17.) For example, Prysm's blockchain course with Wharton was titled "The Economics of Blockchain and Digital

Assets Executive." (See Dkt. No. 18-14 at 25.) Prysm takes issue with Defendants' course offerings on blockchain, which are titled "Emerging Tech Strategies: Harnessing AI, IoT, Web3, and Beyond," "Fintech Innovation: Disrupting the Financial Landscape," and "Berkeley Fintech: Frameworks, Applications, and Strategies." (See Dkt. No. 18-16 at 3.) Based on these titles, which is the only information Prysm has provided, there is no basis to conclude that Defendants' courses are based on Prysm's blockchain materials. Prysm's allegations and appended materials regarding its metaverse and green technology courses are even more sparse and suffer the same deficiencies. (See Am. Compl. ¶ 198; Dkt. No. 18-17.) Ultimately, that Prysm and Defendants have offered online courses on the same broad topics, without more, is insufficient to defeat a motion to dismiss. See Twombly, 550 U.S. at 570 (where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed").

Second, Prysm's vague references to its course materials and work product are insufficient to allege the elements of a conversion claim. General references to course materials and work product fail to allege that Defendants converted a "specific identifiable thing." See, e.g., BCRS1, LLC v. Unger, No. 20 Civ. 4246, 2021 WL 3667094, at *8-9 (E.D.N.Y.

Aug. 18, 2021) (that defendant copied plaintiff's intellectual property, without any further detail, failed to allege that defendant had converted a specific identifiable thing under New York law).

Further, Prysm's sparse allegations do not suggest that its work product and course materials constitute intangible property that fall within the ambit of a conversion claim. See Arcadia Biosciences, Inc. v. Vilmorin & Cie, 356 F. Supp. 3d 379, 403 (S.D.N.Y. 2019). "New York has made exceptions to the general principle that intangible property is not subject to a claim of conversion," Harris v. Coleman, 863 F. Supp. 2d 336, 344 (S.D.N.Y. 2012), and "an electronic record stored on a computer is subject to a claim of conversion." Kim v. Lee, 576 F. Supp. 3d 14, 33 (S.D.N.Y. 2021). However, "in the intellectual property context, there is a difference between an electronic record of an intangible interest and the intangible interest itself." Arcadia Biosciences, Inc., 356 F. Supp. 3d at 404; see id. (explaining that a patent assignment could support a conversion claim, but the patentable idea itself could not).

Accordingly, electronic records that manifest an intangible interest, such as "a master recording embodying a musical performance, the [U.S. Patent and Trademark Office's] record of patent ownership, and certificates of stock,

43

promissory notes, and other papers of value," may be subject to a conversion action. Grgurev, 229 F. Supp. 3d at 286 (citations omitted); see also Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 613, 618 (S.D.N.Y. 2003) (plaintiff could maintain a claim for conversion of his website because the defendant "obtain[ed] a copyright on the website, effectively co-opting [the plaintiff's] idea").

Here, Prysm's vague allegations do not support that its work product and course materials constitute electronic records that manifest an intangible interest. Rather, Prysm's course materials and work product appear to be intangible "ideas, designs, and concepts, [which are] not actionable." Buttner v. RD Palmer Enters., Inc., No. 13 Civ. 0342, 2013 WL 6196560, at *2 (N.D.N.Y. Nov. 27, 2013) (citation omitted); see Arcadia Biosciences, Inc., 356 F. Supp. 3d at 403-04 (plaintiff's intellectual property, which included PowerPoint presentations and detailed disclosures of technical information, could not be subject to a claim of conversion under New York law even though defendants allegedly used these materials for their own commercial development to unfairly compete with plaintiff).

Further, Prysm does not allege that it was denied access to its own work product or course materials, a requirement of a conversion claim under New York law. See Caremex S.A. de

44

C.V. v. Jayden Star LLC, No. 23 Civ. 11051, 2025 WL 1047454, at *3 (S.D.N.Y. Apr. 7, 2025) ("[C]ourts have dismissed conversion claims where the defendant merely copied information or files but did not exclude the plaintiff from such access."); Geo Grp., Inc. v. Community First Servs., Inc., No. 11 Civ. 1711, 2012 WL 1077846, at *9 (E.D.N.Y. Mar. 30, 2012) (holding that wrongful taking of plaintiff's work product did not give rise to conversion claim because plaintiff was not denied access to the work product).

Although Prysm alleges that it can no longer use the coursework materials for its own commercial benefit, (see Am. Compl. ¶ 210), such a threadbare recital of an element of a conversion claim without an accompanying factual basis is insufficient to survive a motion to dismiss. See Morgulis v. Bus Patrol Am., LLC, No. 24 Civ. 113, 2024 WL 3639126, at *8 (S.D.N.Y. Aug. 1, 2024). As explained above, Prysm has not pointed to any similarities between the courses aside from the general topics. And as currently alleged, the Court is not persuaded that Defendants' course offerings at a handful of universities prohibit Prysm from offering similar courses at any other university. For example, that Defendants are concurrently running three blockchain courses at different universities (which are all allegedly based on Prysm's materials) suggests that universities will market an online

course even if similar offerings exist at other universities. (See Am. Compl. ¶ 206; Dkt. No. 18-16 at 3.) Considering that Prysm offers courses worldwide, Prysm has not plausibly alleged that it is precluded from using its work product on the topics of blockchain, green technology, and the metaverse.

For the reasons explained above, Prysm's conversion claim (Count VIII) is **DISMISSED**.

E.   <u>MISAPPROPRIATION OF TRADE SECRETS</u>

To state a claim for misappropriation of trade secrets, a plaintiff must allege the existence of a trade secret, which is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." <u>Softel, Inc. v. Dragon Med. & Sci. Commc'n, Inc.</u>, 118 F.3d 955, 968 (2d Cir. 1997) (citation omitted). Additionally, a plaintiff must allege that "defendants are using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." <u>Ferring B.V.</u>, 932 F. Supp. 2d at 509 (citation omitted). "Improper means" is defined as "fraudulent misrepresentations to induce disclosure, tapping of telephone wires, eavesdropping or other espionage . . . . In general they are means which fall below the generally

accepted standards of commercial morality and reasonable conduct." <u>Town & Country Linen Corp. v. Ingenious Designs LLC</u>, 556 F. Supp. 3d 222, 255 (S.D.N.Y. 2021) (citation omitted).

Prysm's misappropriation claim is based on (1) the CIP and (2) the materials and work product for Prysm's courses on blockchain, green technology, and the metaverse. (<u>See</u> Am. Compl. ¶ 213.) The Court addresses each theory in turn.

First, Prysm's claim that Defendants misappropriated a trade secret by sharing the CIP with Wharton must be dismissed as duplicative of its breach of contract claim, which is based on Defendants' improper disclosure of the CIP. (<u>See</u> <u>id.</u> ¶¶ 145-46, 203, 212-15.) "Courts in this Circuit routinely dismiss claims for misappropriation of trade secrets that duplicate a breach of contract claim because New York does not permit the same conduct to be assigned as both a breach of contract and a tort." <u>Sell It Soc., LLC v. Strauss</u>, No. 15 Civ. 970, 2018 WL 2357261, at *6 (S.D.N.Y. Mar. 8, 2018) (citation and alteration omitted); <u>see</u> <u>id.</u> (dismissing misappropriation claim that was based on the same conduct as the claim for breach of the non-disclosure agreement); <u>see</u> <u>BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp.</u>, 716 F. Supp. 3d 206, 227-28 (S.D.N.Y. 2024) (dismissing misappropriation claim where defendant did

not dispute that an enforceable agreement applied to the conduct concerning the breach of contract claim).

Second, Prysm's allegations concerning its online courses fail to state a misappropriation claim. As explained above, Prysm has not sufficiently alleged that Defendants actually used Prysm's work product and materials for their own blockchain, green technology, or metaverse courses. See AEB & Assocs. Design Grp., Inc. v. Tonka Corp., 853 F. Supp. 724, 734 (S.D.N.Y. 1994) ("A plaintiff cannot recover for misappropriation absent a showing that its ideas were actually used by the defendant.").

Further, Prysm has failed to allege that its course materials and work product comprise trade secrets. "Courts dismiss trade secrets claims when the alleged trade secrets are not, in fact, secret." Zirvi v. Flatley, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020); see Kenner Parker Toys, Inc. v. Tyco Indus., No. 87 Civ. 1136, 1987 WL 124319, at *2 (S.D.N.Y. Apr. 20, 1987) ("[T]he subject of a trade secret must be secret, and must not be of public knowledge or general knowledge in the trade."). Moreover, a trade secret law "does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering." Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974).

That Prysm's course materials and work product contained confidential information is insufficient to state a misappropriation claim, as confidential materials are not synonymous with trade secrets. See Elsevier Inc. v. Dr. Evidence, LLC, No. 17 Civ. 5540, 2018 WL 557906, at *5-6 (S.D.N.Y. Jan. 23, 2018) (trade secrets and confidential information are not interchangeable because the trade secret standard is "far greater than the standard for confidentiality of business information" and "requires much more specificity as to the information owned by the claimant"); GMH Cap. Partners v. Fitts, No. 24 Civ. 00290, 2025 WL 950674, at *8 (S.D.N.Y. Mar. 28, 2025) ("[T]he conclusory allegation that information is valuable to competitors and that [the plaintiff] sought to keep that information secret does not confer trade secret status.").

Moreover, that Prysm's courses were available online undermines its allegations that the course materials and associated work product qualify as trade secrets. (See Dkt. No. 18-11 at 2-3; Dkt. No. 18-14 at 7, 10.) Generally, information is not afforded trade secret protection if the information has been disclosed to others or has been placed in the public domain. See Medicrea USA, Inc. v. K2M Spine, Inc., No. 17 Civ. 8677, 2018 WL 3407702, at *13 (S.D.N.Y. Feb. 7, 2018); see also LinkCo, Inc. v. Fujitsu Ltd., 230 F.

Supp. 2d 492, 499 (S.D.N.Y. 2002) ("Because [the product] cannot remain secret once it is marketed, it cannot rise to the level of a trade secret, as a matter of law."). The Court is mindful that Prysm's work product may have contained confidential information beyond the course materials that were available to students. Nonetheless, Prysm has failed to include the requisite details to explain how any of its work product qualifies as a trade secret. Accordingly, Prysm's misappropriation claim regarding the blockchain, green technology, and the metaverse courses also fails.

For the reasons explained above, Prysm's misappropriation of trade secrets claim (Count IX) is **DISMISSED**.

F.    CIVIL CONSPIRACY

Under New York law, there is no independent tort for civil conspiracy. See Reich v. Lopez, 38 F. Supp. 3d 436, 460 (S.D.N.Y. 2014); Alexander & Alexander of N.Y., Inc. v. Fritzen, 503 N.E.2d 102, 102 (N.Y. 1986) ("[A] mere conspiracy to commit a tort is never of itself a cause of action." (citation omitted)). Thus, a civil conspiracy claim "should be dismissed if the underlying tort claim either is not adequately pleaded or has been dismissed." Hua Xue v. Jensen, No. 19 Civ. 1761, 2020 WL 6825676, at *12 (S.D.N.Y. Nov. 19, 2020) (citation omitted). As explained above, Prysm has not

sufficiently alleged claims for tortious interference, fraudulent inducement, fraudulent concealment, conversion, or misappropriation of trade secrets. Thus, here there are no remaining tort claims to support sufficient allegation of a civil conspiracy.[10] See, e.g., Elevation Health, LLC v. Wong, No. 22 Civ. 10308, 2023 WL 3842256, at *4 (S.D.N.Y. June 6, 2023) (dismissing civil conspiracy claim where plaintiff failed to sufficiently allege any of its underlying tort claims).

Accordingly, Prysm's civil conspiracy claim (Count IV) is **DISMISSED.**

## IV.   ORDER

For the preceding reasons, it is hereby

**ORDERED** that the letter motion (Dkt. No. 24) of defendants Emeritus Institute of Management PTE LTD and Emeritus Institute of Management Inc. to partially dismiss the Amended Complaint of plaintiff Prysm Group, LLC is

---

[10] Prysm's remaining claims assert breach of contract and unjust enrichment and thus cannot sustain a civil conspiracy claim. See AT&T Corp. v. Atos IT Sols. & Servs., Inc., 714 F. Supp. 3d 310, 339 (S.D.N.Y. 2024) ("[C]ivil conspiracy must be derivative of an underlying tort.").

And even if Prysm had sufficiently alleged an underlying tort, the civil conspiracy claim – which alleges that Defendants breached the NDA to integrate themselves with Wharton and harm Prysm as a competitor - would be dismissed as duplicative of the breach of contract claim. (See Am. Compl. ¶¶ 146, 165.) See Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc., No. 20 Civ. 4210, 2021 WL 665031, at *3 (S.D.N.Y. Feb. 19, 2021) (dismissing civil conspiracy claim as duplicative of breach of contract claim where the conspiracy claim was based on the same conduct but included possible motives for the breach).

**GRANTED**. Counts II, III, IV, V, VI, VIII, and IX of the Amended Complaint (Dkt. No. 18) are dismissed without prejudice.


**SO ORDERED**.

Dated:    2 July 2025
          New York, New York

                                    _____
                                         Victor Marrero
                                            U.S.D.J.